**David GLATTHORN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 92–8068–CIV.**

United States District Court,
S.D. Florida.

April 13, 1993.

David Glatthorn, pro se.

A.B. "Brian" Phillips, U.S. Dept. of Justice, Tax Div., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAINE, Senior District Judge.

Upon a non-jury trial held Monday, April 5, 1993, the Court enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

#### Facts

1. Plaintiff, DAVID GLATTHORN ("GLATTHORN"), was employed as an associate with the law firm of Ingalsbe, McManus, Wiitala, and Contole, P.A. ("IMWC") on or about December 26, 1984, pursuant to an employment contract.

2. GLATTHORN was hired to work exclusively with two of IMWC's four partners, David Wiitala, Esquire ("Wiitala") and William Contole, Esquire ("Contole").

3. IMWC originally agreed to pay GLATTHORN a salary of "$30,000.00 and 20% of billing credits received over $100,-000.00, as collected, or paid on a quarterly basis."

4. This financial arrangement was modified orally and in writing during GLATTHORN's tenure with the firm.

5. A December 10, 1985 memorandum regarding 1986 allocations provided that GLATTHORN would receive $30,000.00 and "20% of monies he brings in in excess of his overhead." Overhead was described only as one-third of the firm overhead charged to Wiitala and Contole plus any individual expenses.

6. Client costs were treated as attorney overhead under a "pay as you go" system. When IMWC advanced a cost in a particular case, the overhead of the attorney handling that case would be charged dollar for dollar. An attorney's bonus would, therefore, be decreased by the cost advance. When the client subsequently reimbursed the firm, the attorney's overhead would be credited accordingly.

7. In May 1986, IMWC hired another lawyer, John Case ("Case"), to work with Wiitala and Contole.

8. Upon Case's hiring, IMWC represented to GLATTHORN that the firm overhead charged to Wiitala and Contole would be split four ways, thus decreasing his share of the common expenses.

9. Case quit his job in January 1987.

10. Between 1987 and 1988, John Cecilian worked as an associate with IMWC. His compensation included a similar incentive bonus for billings above overhead, which was calculated as a share of common expenses plus individual expenses.

11. During 1987, GLATTHORN's quarterly bonus was increased to forty percent (40%) of net profits.

12. GLATTHORN eventually became suspicious that his overhead was not being properly calculated. In the spring of 1988, he asked to review the IMWC's expense records, claiming that his right of access was an express condition of employment.

13. Wiitala and Contole denied him access to the expense records, deeming them proprietary material of the firm.

14. GLATTHORN continued to insist on his right to examine the expense records.

15. Lorraine Giarrusso ("Giarrusso"), the bookkeeper for IMWC, prepared a handwritten summary of Wiitala and Contole's firm expenses for the three months ending March 31, 1988.

16. GLATTHORN was dissatisfied with the summary and insisted on a review of the underlying expense records.

17. By memorandum dated June 23, 1988, Wiitala informed GLATTHORN that he could meet with Giarrusso to review the expense sheets for 1986 through March 31, 1988, then meet with himself and Contole to discuss specific expense items.

18. GLATTHORN did, in fact, review the expense records in late June 1988. He concluded that IMWC's calculation of his overhead improperly included (i) several personal expenses of other attorneys, and (ii) one-third, rather than one-fourth, of the firm common expenses, both of which resulted in an inflated overhead figure.

19. On June 27, 1988, GLATTHORN requested an adjustment to his expenses based on these miscalculations.

20. On July 11, 1988, IMWC terminated GLATTHORN for no stated reason.

21. GLATTHORN thereafter demanded payment of (i) client cost advances that had been charged against his overhead, and (ii) 40% of his fees for all work that was not billed or billed but not paid.

22. IMWC agreed to pay the client costs, but denied that any other money was owed.

23. GLATTHORN hired Nicholas Maniotis, Esquire ("Maniotis") to represent him in negotiations with IMWC.

24. During these negotiations, the firm calculated the cost advances charged to GLATTHORN. IMWC promised to make full repayment of the costs, but did not do so.

25. On or about September 16, 1988, GLATTHORN sued IMWC and its partners, individually and as partners, in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. The Complaint contained five counts: (i) Accounting; (ii) Conversion; (iii) Anticipatory Breach of Contract; (iv) Breach of Contract; and (v) Escrow of Fees.

26. On or about October 12, 1988, IMWC and its partners filed a Motion to Dismiss Complaint.

27. On or about December 15, 1988, GLATTHORN filed an Amended Complaint against IMWC, Wiitala, and Contole, which contained eleven counts: (i) Breach of Contract; (ii) Civil Theft Against Defendant Contole; (iii) Civil Theft Against Defendant Wiitala; (iv) Fraud Against Defendant Contole; (v) Fraud Against Defendant Wiitala; (vi) Conversion Against Defendant Contole; (vii) Conversion Against Defendant Wiitala; (ix) Civil Theft Against Defendant IMWC; (x) Fraud Against Defendant IMWC; (xi) Conversion Against Defendant IMWC; and (xii) Accounting.[1]

28. On or about December 28, 1988, before any discovery had been taken, GLATTHORN filed an Offer of Judgment pursuant to Section 45.061, Florida Statutes,[2] in the amount of $45,000.00.

29. Based upon the information available to them at that time, GLATTHORN and his counsel, Maniotis, estimated that they could recover at least $47,000.00 for outstanding wages, $27,000.00 for civil theft of the cost advances, and $20,000.00 for improper overhead charges.

30. In making the Offer of Judgment, GLATTHORN and Maniotis sought a figure that GLATTHORN would be willing to accept in settlement, but could easily exceed by more than twenty-five percent at trial, thereby injecting fee liability into the case. They discussed $55,000.00 or $60,000.00, but decided upon $45,000.00 as an appropriate "low-ball" offer. It was not a scientific calculation. GLATTHORN expected IMWC to reject the offer based on its "hard line" approach throughout the negotiations and litigation.

31. On or about January 3, 1989, Defendants filed a Motion to Dismiss and Motion to Strike Plaintiff's Amended Complaint, therein attacking all eleven counts of the pleading.

32. Following a hearing in January 1989, Circuit Judge Edward Rodgers declined to dismiss any tort claims. His ruling was not reduced to writing.

33. Defendants filed an Acceptance of Offer of Settlement dated February 6, 1989.

34. At Defendants' request, GLATTHORN, for the consideration of $45,000.00, signed a general release of all claims and stipulated to the dismissal of the lawsuit. The parties did not, however, execute a formal settlement agreement.

35. Defendants did not pay $45,000.00, before the case was at issue or discovery taken, simply to settle a $47,000.00 contract claim. Rather, their decision to pay was based in part upon the presence of the tort claims.

36. The $45,000.00 settlement check was drawn against an IMWC general account, but then internally allocated by the firm to Wiitala and Console. Ingalsbe and McManus, therefore, did not contribute to the settlement.

37. In early 1990, IMWC issued an IRS Form 1099, designating the $45,000.00 paid to GLATTHORN as "non-employee compensation."

38. GLATTHORN included the $45,-000.00 within his gross income for the tax year 1989, but filed a Form 1040X seeking a full refund of the $12,635.00 paid in taxes on this sum.

---

1. The copy of the Amended Complaint introduced at trial, as well as every copy in the court file, is missing one page that includes paragraph 65 and, perhaps, a Count VIII.

2. Section 45.061 provides, in pertinent part:
   (1) [A]ny party may serve upon an adverse party a written offer ... to settle a claim for the money, property, or relief specified in the offer and to enter into a stipulation dismissing the claim or allowing judgment to be entered accordingly....

   (2) If, upon a motion by the offeror within 30 days after the entry of judgment, the court determines that an offer was rejected unreasonably, resulting in unnecessary delay and needless increase in the cost of litigation, it may impose an appropriate sanction upon the offeree.... An offer shall be presumed to have been unreasonably rejected by a defendant if the judgment entered is at least 25 percent greater than the offer rejected....

**Law**

1. This Court has jurisdiction to hear the refund claim. 26 U.S.C. § 7422; 28 U.S.C. § 1346.

2. Section 61 of the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 61, broadly defines gross income as "all income from whatever source derived." Section 104(a)(2), however, specifically excludes from gross income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." IRS regulations explain that the exclusion covers "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." 26 C.F.R. § 1.104–1(c).

■ 3. The tax consequences of a settlement depend upon the nature, rather than the validity, of the claims settled. *Villaume v. United States,* 616 F.Supp. 185, 187 (D.Minn.1985) (citing *Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970)).

■ 4. When a lump sum settlement encompasses both tort and contract claims, an allocation must be made between and among the various claims. If the parties themselves do not make the allocation in a settlement agreement, the court must do so. *Eisler v. Commissioner,* 59 T.C. 634, 640 (1973). The court should consider several factors, including the pleadings, the evidence, the terms of the settlement, and the intent of the payor. *See Threlkeld v. Commissioner,* 87 T.C. 1294, 1306 (1986), *aff'd,* 848 F.2d 81 (6th Cir.1988). "In a given case, any one of these factors may be ultimately persuasive or ignored." *Id.* "The nature of the payments ... is a question of fact to be decided from a consideration of all the factors surrounding the payment." *McKim v. Commissioner,* 40 Tax Ct.Mem.Dec. (CCH) 9, 12 (March 26, 1980) (citing *Knuckles v. Commissioner,* 349

F.2d 610, 613 (10th Cir.1965); *Agar v. Commissioner,* 290 F.2d 283, 284 (2d Cir.1961); *Seay v. Commissioner,* 58 T.C. 32 (1972)).[3]

5. The allocation between taxable and non-taxable income is not an "all or nothing" proposition. In *Eisler,* 59 T.C. at 640–41, the United States Tax Court, exercising its "best judgment based upon the entire record ... endeavor[ed] to make as close an approximation as we could in regard to what we considered to be the respective weights that the parties in fact placed upon the relative values of their respective claims...." It thereafter apportioned only $135,000.00 of a $235,000.00 settlement payment to a potential negligence claim.[4] In *Byrne v. Commissioner,* 90 T.C. 1000, 1011 & n. 9 (1988), the court applied *Eisler* and "estimate[d] that the claims settled here were tort-like claims or had tort-like elements to the extent of 50 percent and that the balance is taxable." On appeal, the Third Circuit Court of Appeals reversed, holding that the taxpayer was entitled to exclude the entire $20,000.00 settlement from income. 883 F.2d 211 (3d Cir.1989). But the general concept of partial taxability was not criticized.

■ 6. GLATTHORN argues that at least 9/11 of the settlement is non-taxable, as nine of the eleven counts in his Amended Complaint sounded in tort. The undersigned declines to apply such a strict mathematical formula, particularly since many of the tort counts stated the same cause of action against a different defendant.

7. Nonetheless, GLATTHORN has satisfied his burden of proving that Defendants placed some value on the tort claims in deciding to settle. Defendants did not file their Acceptance of Offer of Settlement until the civil theft counts survived the motion to dismiss. It strains reason to believe that an accomplished law firm would pay nearly 96 cents on the dollar to settle a straightforward breach of contract action in its early stages. The release requested by Defendants cer-

---

3. In its Trial Brief, the Government cited *Kurowski v. Commissioner,* 917 F.2d 1033, 1036 (7th Cir.1990), for the proposition that the intent of the payor is controlling. In closing argument, however, the Government acknowledged that the great majority of cases consider all relevant circumstances, and, in the absence of controlling

Eleventh Circuit precedent, agreed that the majority test should be applied.

4. Interestingly, the tort claim had not even been raised in the pleadings, although the parties were aware of the possibility of amendment.

tainly did not limit itself to contract claims. IMWC's subsequent issuance of a Form 1099 was, in all likelihood, designed to discourage any speculation that the firm had defrauded GLATTHORN or stolen his money.

### Disposition

The Court, using its best judgment based upon the entire record, finds that the pending contract and tort claims played equally important roles in Defendants' decision to settle. Therefore, $22,500.00 of the $45,000.00 settlement will be allocated to nontaxable tort recovery, the remainder to taxable contract recovery.

It is hereby **ORDERED and ADJUDGED** that:

1. GLATTHORN shall recover a refund of $6,317.50, one-half the tax paid on the $45,000.00 settlement proceeds.[5,6]

2. Pursuant to Federal Rule of Civil Procedure 58, the Clerk of the Court shall enter Final Judgment accordingly.

3. The Clerk of the Court shall thereafter close this file and declare all pending motions moot.

DONE and ORDERED.

---

5. It is assumed that the $45,000.00 was taxed at a single rate, although a tax of $12,635.00 would indicate a rate of 28.078 percent. If the money was taxed at different rates, so that a refund on $22,500.00 does not equal one-half of the tax paid, either party may move to amend the judgment accordingly.

6. GLATTHORN did not request, so the Court need not address, interest on the refund.