T.C. Memo. 1998-4


UNITED STATES TAX COURT


JOHN R. AND SARA E. WISE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6344-96.                    Filed January 5, 1998.


<u>John A. Mase</u>, <u>Howard S. Hou</u>, and <u>Mark A. Byrne</u>, for
petitioners.

<u>Mark A. Weiner</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined a $283,425 deficiency in
petitioners' 1989 Federal income tax.  The sole issue for decision
is whether $1,012,233 received by John R. Wise as a result of the
termination of his employment is excludable from petitioners' 1989

gross income pursuant to section 104(a)(2) as damages received on account of personal injury or sickness.

All section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

John R. and Sara E. Wise resided in Northridge, California, at the time the petition was filed. John R. Wise (petitioner) was born on October 20, 1940.

Weyerhaeuser Co.

In 1968, petitioner began working for Weyerhaeuser Co. (WC) as a loan officer. WC is in the home-building and mortgage business. Petitioner later worked for Weyerhaeuser Mortgage Co. (WMC), a WC subsidiary. Petitioner rose through the ranks at WMC, and by the late 1980's he became its president and chief executive officer. At that time, WMC was the third or fourth largest mortgage company in the United States.

Petitioner also served in the late 1980's as chief executive officer of Republic Federal Savings and Loan (RFSL), another WC subsidiary, and as chairman of the board of directors of Mortgage Investments Plus (MIP), a publicly owned real estate investment

trust that made investments in commercial real estate. MIP was not a WC subsidiary but was managed by WC.

During the year in issue, petitioner managed all of WC's financial service subsidiaries and was responsible for approximately 2,000 employees. He was one of the 10 most highly compensated individuals at WC, earning a base salary of $279,232.56 in 1989. Petitioner did not have a written contract with WMC or WC.

Although WC policy required that employees receive annual employment reviews, petitioner never received such a review. Nevertheless, he always received bonuses when he became eligible.

Between 1980 and April 1989, John W. Creighton served as petitioner's immediate supervisor. Mr. Creighton and petitioner were close friends. At the time of trial, Mr. Creighton was the chief executive officer and chairman of the board of WC.

Within WC's financial services chain of command, petitioner was the number 3 person, below George Weyerhaeuser and Mr. Creighton.

Communications Before Petitioner's Termination

In 1988, petitioner expressed a concern to Mr. Creighton that because of the developing trend to consolidate in the mortgage banking industry, there was a strong possibility that WC would sell WMC, which might then leave petitioner unemployed. In response to this concern, Mr. Creighton orally assured petitioner that WC

would be "fair" with petitioner if WMC were sold. Petitioner was not satisfied with this general assurance; he wanted a long-term employment contract in writing, with a substantial severance pay provision in the event of WMC's sale.

From 1983 to 1989, the value of RFSL's assets increased from $600 million to $2 billion. Petitioner believed he was primarily responsible for building and increasing the value of RFSL and of WMC; therefore he wanted to be adequately compensated in the event of WMC's sale. Mr. Creighton informed petitioner that a long-term written employment contract would be forthcoming.

In early 1989, Mr. Weyerhaeuser announced to WC's senior management that the company had decided to liquidate its noncore businesses. WMC and RFSL were part of WC's noncore enterprises.

Mr. Creighton and petitioner continued their discussions regarding a long-term employment contract for petitioner. On January 4, 1989, petitioner wrote a letter to Mr. Creighton, memorializing petitioner's understanding of the proposed employment contract they had discussed. Petitioner understood that the terms of the forthcoming contract would include: (1) A provision entitling petitioner to a $280,000 annual base salary and a guaranteed incentive bonus of $70,000 annually over a period of 5 years; and (2) a severance package equal to 3 years of salary, or $1 million, in the event of WMC's sale. Petitioner did not receive

a written response from Mr. Creighton. However, petitioner was repeatedly assured he would receive a written contract.

The Termination

On a Friday evening sometime in April 1989, Mr. Creighton telephoned petitioner to inform petitioner that his employment with WMC was being terminated effective immediately. Petitioner inquired as to the amount WC would pay him in connection with the termination of his employment. Mr. Creighton offered petitioner approximately $560,000.[1]  Petitioner rejected Mr. Creighton's offer.

The following day Mr. Creighton telephoned petitioner again, offering approximately $700,000 in connection with the termination of petitioner's employment. Petitioner rejected this second offer, suggesting that he would only accept a figure greater than $1 million. Mr. Creighton replied that he would discuss this counteroffer with Mr. Weyerhaeuser.

On Sunday, the following day, Mr. Creighton telephoned petitioner, offering $1,125,000 in connection with the termination of petitioner's employment.  Petitioner accepted this offer.

---

[1]  It appears that Mr. Creighton computed the $560,000 figure by multiplying petitioner's annual salary by two.  This amount was far in excess of the amount called for by WC's formal severance pay plan.  (According to the severance pay plan in effect at the time, qualified individuals were "eligible to receive one weeks' [sic] earnings up to a maximum of eight weeks' earnings, for each year of credited service".)

At the time petitioner's employment was terminated, he had been employed by WC for approximately 21 years.

Settlement Agreement and General Release

Following petitioner's acceptance of Mr. Creighton's $1,125,000 offer, attorneys became involved in drafting the settlement agreement. Petitioner's attorney attempted to insert a statement in the draft agreement that the $1,125,000 payment was in consideration for tort liabilities. WC's assistant general counsel specifically refused to acknowledge that WC's $1,125,000 payment to petitioner was in consideration for any tort liabilities.

On May 16, 1989, petitioner and Mr. Creighton (on WC's behalf) signed a Settlement Agreement and General Release of All Claims (General Release). Pursuant to the General Release, petitioner was paid $1,125,000 in consideration for releasing all potential causes of action against WC and WMC. In this regard, the General Release stated:

> The Cash Payment shall represent full and complete satisfaction, settlement and release by Wise of any and all claims he has or may have against any entity in the Weyerhaeuser Group, or any director, officer of [sic] employee of any entity in the Weyerhaeuser Group for salary, bonus and other incentive compensation, severance pay or other compensation based on termination of employment and accrued and unpaid vacation pay.
>
> *       *       *       *       *       *       *
>
> Wise does as of the Effective Date release Weyerhaeuser, each subsidiary of Weyerhaeuser, and each director, officer, employee and agent

of Weyerhaeuser and each subsidiary of Weyerhaeuser, from any and all claims that Wise has asserted or could assert under federal, state or municipal laws, executive orders, or any federal, state or municipal regulations or rules based on, arising out of, or relating to his employment by WMC, the termination of such employment, his service as a director or officer of any subsidiary of Weyerhaeuser or the termination of such service, including, without limitation, claims under age discrimination laws of the United States or the State of California, claims of intentional or negligent injury, and claims for back or future wages, compensation or benefits, except as provided for in Section 1 of this Agreement, claims of right or entitlement to reinstatement of employment by WMC or any other entity in the Weyerhaeuser Group as to any position or job whatsoever, claims of negligent, intentional or unintentional infliction of emotional distress, claims based on oral or written contracts of employment, claims based on discrimination laws of the United States and claims for attorney's fees and costs, as a prevailing party or otherwise, and claims for damages for pain and suffering, personal injury and consequential damages except for claims based on breach of this Agreement.

In addition to petitioner's release of all claims against WC, petitioner agreed to resign from his position as a director and officer of MIP. Petitioner also resigned from his position at RFSL.

Petitioner did not suffer any injury or sickness at the time he entered into the settlement agreement.

Petitioners' 1989 Federal Income Tax Return

On their 1989 Federal income tax return petitioners included in income $112,767 of the $1,125,000 settlement payment petitioner received from WC. (Petitioner arrived at the $112,767 amount by

using a 1 week's pay per year of service method.)  Petitioners provided the following explanation on the last page attached to their return:  "Other Disclosure: The taxpayer received 1012233 from Weyerhaeuser Co. as settlement for mental anxiety and injury to personal reputation caused upon termination of employment."

Notice of Deficiency

In the notice of deficiency, respondent determined that the entire $1,125,000 settlement payment petitioner received from WC is includable in petitioners' 1989 gross income.

OPINION

The sole issue for decision is whether $1,012,233 ($1,125,000 less $112,767) received by petitioner as a result of the termination of his employment is excludable from petitioners' 1989 gross income pursuant to section 104(a)(2) as damages received on account of personal injury or sickness.  Petitioners argue that they are entitled to exclude that amount.  Respondent disagrees.

Except as otherwise provided, gross income includes income from all sources.  Sec. 61; Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-430 (1955).  Although section 61(a) is to be broadly construed, statutory exclusions from income must be narrowly construed.  Commissioner v. Schleier, 515 U.S. 323, 327-328 (1995).

Pursuant to section 104(a)(2), gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of

personal injuries or sickness".  The regulations provide that "The term 'damages received (whether by suit or agreement)' means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution."  Sec. 1.104-1(c), Income Tax Regs.  Thus, in order to exclude damages from gross income pursuant to section 104(a)(2), the taxpayer must prove that: (1) The underlying cause of action is based upon tort or tortlike rights, and (2) the damages were received on account of personal injuries or sickness.  Commissioner v. Schleier, supra at 336-337.

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement controls whether such amounts are excludable from gross income under section 104(a)(2).  United States v. Burke, 504 U.S. 229, 237 (1992).  The crucial question is "in lieu of what was the settlement amount paid?"  Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997). Determining the nature of the claim is a factual inquiry.  Robinson v. Commissioner, 102 T.C. 116, 127 (1994), affd. in part, revd. in part and remanded 70 F.3d 34 (5th Cir. 1995).

In the instant case, it is unclear that the General Release included a settlement of petitioner's claims for wrongful termination rather than a general severance package.  But even assuming arguendo that it did include a settlement for some type of

wrongful termination, petitioners are not entitled to exclude from income any part of the proceeds received.

Petitioners have not proven what portion, if any, of the $1,125,000 payment was received in settlement of tort or tortlike claims. The General Release does not make any allocation between tort (or tortlike) claims and other types of claims. The General Release identifies many potential claims which could be interpreted as sounding in contract or in tort. Thus, from the record before us it is impossible to differentiate the actual basis for settlement. And failure to show the specific amount of the payment allocable to the claims of tort or tortlike damages for personal injuries results in the entire amount's being presumed not to be excludable. See Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994); Getty v. Commissioner, 91 T.C. 160, 175-176 (1988), affd. on this issue and revd. on other issues 913 F.2d 1486 (9th Cir. 1990).

Petitioner asserts that the General Release settled his claim for damages for personal injuries. We do not agree. The General Release does not state that the amount petitioner received was paid to settle a potential personal injury claim against WC. And where a settlement agreement lacks express language stating what the settlement amount was paid to settle, then the most important factor is the intent of the payor. Knuckles v. Commissioner, 349 F.2d 610, 612-613 (10th Cir. 1965), affg. T.C. Memo. 1964-33.

WC did not identify a portion of the payment as a settlement of a claim on account of a personal injury. The payment herein appears to be in the nature of taxable severance pay rather than a payment for personal injury. We believe it is no coincidence that the settlement payment to petitioner approximates the amount of severance pay Mr. Creighton and petitioner had discussed as an essential term in the long-promised employment contract. (The settlement amount was slightly over four times petitioner's then-current base salary.) Severance pay is taxable income. Brennan v. Commissioner, T.C. Memo. 1997-317.

Undoubtedly, petitioner was affected by WC's actions; however, he has made no showing of any specific tort or personal injury. Although wrongful employment termination possibly may result in personal injury, the amount of lost wages received in such cases is generally not linked to that personal injury, and, thus, such an award will not qualify for the exclusion from gross income provided in section 104(a)(2). Commissioner v. Schleier, supra at 330. In this case, there is no link to personal injury.

Petitioner contends that Banks v. United States, 81 F.3d 874 (9th Cir. 1996), is controlling. We disagree. In Banks, the taxpayer was employed as a steel worker. He was punched by a fellow employee who was a former boxer, rendering Mr. Banks unconscious and requiring 32 stitches to repair a wound to his forehead. The company attempted to discharge Mr. Banks and his fellow employee for

fighting. The union filed a grievance on Mr. Banks' behalf and subsequently settled the matter; Mr. Banks objected to the terms of the agreement. He then sued the union for breach of its duty of fair representation. Mr. Banks prevailed on that cause of action in the district court and agreed to settle with the union before the entry of judgment.

Mr. Banks did not report as income the amount he received from the union, and after examination and assessment, he paid the tax and sued for a refund. He prevailed in the District Court, where the court held that the settlement was of a tortlike cause of action and the sum paid for the breach of duty of fair representation was on account of personal injuries within the meaning of section 104(a)(2). Banks v. United States, 94-2 USTC par. 50,630 (W.D. Wash. 1994). The U.S. Court of Appeals for the Ninth Circuit affirmed, noting that "Unions do not pay wages to their members, and what the Union paid in settlement here to Banks did not constitute wages." 81 F.3d at 876.

In this case, the $1,125,000 settlement payment compensated petitioner for his 21 years of past service in building the value of WMC and related entities, as well as for his amicable severance of employment from WC generally. See, e.g., Britell v. Commissioner, T.C. Memo. 1995-264. Petitioner has not demonstrated what injuries he had or might have had as a result of his termination. Petitioner did not testify as to why he believed he

was terminated. Indeed, he simply failed to present any evidence that the settlement he received included a settlement of a tortlike cause of action on account of personal injuries or sickness.

We have considered all of petitioners' other arguments and, to the extent not discussed above, find them to be without merit.

In sum, the entire $1,125,000 settlement payment petitioner received is includable in petitioners' 1989 gross income.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.