**Andrew PIPITONE and Joanne Pipitone, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 97 C 4751.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 24, 1998.

Andrew Pipitone, Chicago, IL, pro se.

Douglas W. Snoeyenbos, United States Department of Justice, Washington, DC, for U.S.

***OPINION and ORDER***

NORGLE, District Judge.

Before the court are cross motions for summary judgment. For the following reasons, Defendant's motion (Doc. No. 8) is granted and Plaintiffs' motion (Doc. No. 13) is denied.

## I. BACKGROUND

This is a tax refund action. From December 1981 until January 1995, Plaintiff Andrew Pipitone ("Pipitone") was an at-will employee in the claims department of CNA Insurance Companies ("CNA"). His title was "Vice–President Claims Legal Services." On January 13, 1995, CNA terminated Pipitone; he was 49 years old at the time.

In connection with his termination, Pipitone and CNA entered into an agreement entitled "General Release in Full and Settlement Agreement" ("the Agreement"). Dated January 13, 1995, the Agreement provides, in relevant part:

Whereas your employment with the Company will be ending January 13, 1995;

Whereas you and the Company now desire to effect a final settlement of all matters concerning the terms and conditions of the employment relationship and the termination of that employment relationship without the concession of any liability or fault of any kind or nature on the part of either party;

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, you and the Company agree as follows:

1. The Company agrees to pay you ... fifty-two weeks, or $95,000, less applicable Federal, State and Local deductions. The Company will further provide outplacement services and continued coverage under the Company's Employee Health Plan ... through January 31, 1996, if you are enrolled in them now and prepay all employee-rate contribution premiums for each of the selected coverages. You acknowledge and agree that the Company does not normally pay this amount of compensation nor provide continued health or life insurance benefits to terminated employees with your length of service with the Company, and that the payment to you of such amounts and the providing of such insurance benefits constitutes an exception to normal Company policy.

2. With the exception of your eligibility for retirement benefits under the Company's retirement plan, you ... hereby release and forever discharge the Company to the fullest extent provided by law, from any and all matters, claims, actions, demands, causes of action, accounts, obligations or liabilities arising out of and relating to your employment of every nature and kind whatsoever in law or in equity that you now have or ever had from beginning of time to the date of the execution of this Agreement, whether now known or unknown, against the Company including, but not limited to, any right to severance or benefits other than that specified in the instant Agreement and any claims you have pursuant to the provisions of the Age Discrimination in Employment Act of 1967, as amended.

3. You ... covenant (a) not to file a claim with any local, state or federal government agency, department or commission alleging the Company as a respondent, defendant or participant, and (b) not to accept any relief which might be awarded to you by any such local, state or federal governmental agency, department or commission, and (c) not to sue the Company pursuant to any provision of the United States Code, including but not limited to the Age Discrimination in Employment Act of 1967, as amended, or any local or state law with respect to any and all matters ... released and discharged pursuant to the terms of this Agreement.

7. You acknowledge and agree that this Agreement constitutes the entire agreement and understanding between you and the Company. You further acknowledge and agree that in executing this Agreement, you have not relied on any promises or representations other than those set forth in this Agreement.

13. It is agreed and understood that the Company denies the existence of any liability to you and that the instant Agreement is intended solely to accomplish a settlement and is not to be construed as an admission of fault or liability of any kind or nature on the part of the Company.

(Pl.'s Rule 12(M) Stmt., at Ex. E.) Pipitone signed the Agreement on January 20, 1995.

In his 1995 income tax return Form 1040, Pipitone reported the $95,000 payment as

income, and paid the corresponding tax. In August 1996, however, Pipitone filed an amended tax return Form 1040X, in which he claimed that his original return was in error.[1] In his amended return, Pipitone excluded the $95,000 from income and sought a refund of $32,511. Pipitone offered the following explanation in an attached Form 8275 "Disclosure Statement":

> The Taxpayer has reduced his income ... by *$95,000*, representing the amount paid by the Taxpayer's employer to him upon termination of his employment. The Taxpayer, upon advice of counsel, believes that this payment is not taxable under Section 104 of the Internal Revenue Code because the payment was made in consideration to the Taxpayer for his release of his employer for any claim he might have against his employer for age discrimination and other potential tort claims.

(Pls.' Rule 12(M) Stmt., at Ex. A.).

In a letter dated October 25, 1996, the Internal Revenue Service rejected Pipitone's claim for a tax refund. The IRS stated that under the United States Supreme Court's decision in *Commissioner v. Schleier,* 515 U.S. 323, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995), "back pay and liquidated damages recovered through the settlement of a claim under the age discrimination in employment act are not excludible from gross income." (Pls'. Rule 12(M) Stmt., at Ex. B.) Pipitone then filed a written appeal with the IRS. (*See id.,* at Ex. C.) In a letter dated March 14, 1997, the IRS again rejected Pipitone's claim based on the decision in *Schleier.* (*See id.,* at Ex. D.) This suit followed. Each party now moves for summary judgment.

## II. DISCUSSION

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "If the non-moving party bears the burden of proof on an issue, that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Sample v. Aldi, Inc.,* 61 F.3d 544, 546 (7th Cir.1995).

■ "A determination by the Commissioner is presumed to be correct and plaintiff bears the burden of proving that determination to be wrong." *Roels v. United States,* 928 F.Supp. 812, 814 (E.D.Wis.1996) (*citing Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933)); *see also First Chicago NBD Corp. v. Commissioner,* 135 F.3d 457, 459 (7th Cir.1998) ("The Internal Revenue Service knows more about tax laws than the judges of the federal appellate courts do, and so it is natural for us to give some weight to its views about the meaning and application of those laws."); *Pittman v. Commissioner,* 100 F.3d 1308, 1313 (7th Cir. 1996).

■ "In a tax refund suit the taxpayer bears the burden of proving the amount he is entitled to recover." *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (*citing Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932)); *see also Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2nd Cir.1993). In other words, Pipitone bears the burden of establishing that he overpaid his tax. *See Lewis,* 284 U.S. at 283, 52 S.Ct. 145 ("[T]he ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax."); *see also Amax Coal Co. v. United States,* 959 F.Supp. 990, 995 (S.D.Ind. 1996).

At issue here is whether the exclusion from income provided in § 104(a)(2) of the Internal Revenue Code ("the Code") entitles Pipitone to a tax refund. *See* 26 U.S.C. § 104(a)(2). Section 104(a)(2) states that "the amount of any damages received (whether by suit or agreement and whether

---

1. A few notes surrounding Pipitone's returns: (1) Pipitone does not include his original return in the record; (2) where his amended return asks for "occupation," Pipitone states that he is an attorney; (3) Pipitone's brother-in-law, a Certi-

fied Public Accountant, assisted in the preparation of both returns; and (4) Joanne Pipitone is also a named plaintiff because she and her husband filed joint returns.

as lump sums or as periodic payments) on account of personal injury or sickness" shall not be included as gross income. "The rationale of the exemption is to free a taxpayer from liability for an amount received as compensation for a loss of that nature." *Kurowski v. Commissioner*, 917 F.2d 1033, 1036 (7th Cir.1990); *see also Commissioner v. Miller*, 914 F.2d 586, 590 (4th Cir.1990). Though § 104(a)(2) provides an exclusion from the broad reach of "gross income" as defined in § 61(a) of the Code,[2] the provision, like any other exclusion from income, "must be narrowly construed." *Schleier*, 515 U.S. 323, 115 S.Ct. at 2163; *see also Kurowski*, 917 F.2d at 1036.

The taxpayer bears the burden of proving the exclusion by showing: (1) "that the underlying cause of action giving rise to the recovery is based on tort or tort type rights"; and (2) that "the damages were received 'on account of personal injuries or sickness.'" *Commissioner v. Schleier*, 515 U.S. 323, 115 S.Ct. 2159, 2167, 132 L.Ed.2d 294 (1995); *see also Banks v. United States*, 81 F.3d 874, 876 (9th Cir.1996). The first requirement "examines the legal basis of the claim for tort-like characteristics, focusing on the scope of remedies available under the statutory scheme." *Dotson v. United States*, 87 F.3d 682, 685 (5th Cir.1996); *see also Brennan v. Commissioner*, 74 T.C.M. (CCH) 69 (1997) ("Where damages are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement controls whether such damages are excludible under section 104(a)(2)."). The second requirement "tests whether the damages received were due to a personal injury rather than mere economic loss." *Dotson*, 87 F.3d at 685; *see also O'Gilvie v. United States*, 519 U.S. 79, 117 S.Ct. 452, 455, 136 L.Ed.2d 454 (1996) (holding that § 104(a)(2) excludes only those damages that were awarded by reason of, or because of, personal injuries). This includes physical in-

juries as well as nonphysical injuries "such as those affecting emotions, reputation, or character." *United States v. Burke*, 504 U.S. 229, 112 S.Ct. 1867, 1870 n. 6, 119 L.Ed.2d 34 (1992). Whether Pipitone satisfies the second requirement is at the heart of this dispute.

Pipitone argues that the $95,000 is excluded from gross income under § 104(a)(2) because the amount represents CNA's payments to him for personal injuries arising from age discrimination under the Illinois Human Rights Act, 775 ILCS 5/101 *et seq.*, slander, and libel. According to Pipitone, the Agreement released "his state law claims pursuant to which he would have been entitled to recover for his personal injuries, including but not limited to emotional distress, pain and suffering, mental anguish, and damage to his reputation." (Pls'. Mem. in Supp. at 2.) As support, Pipitone cites to Treasury Regulation § 1.104–1(c) which provides that the exclusion under § 104(a)(2) applies where damages are received "through a settlement agreement entered into in lieu of [a legal suit or action based upon tort or tort type rights]." Treas. Reg. § 1.104–1(c), 26 C.F.R. § 1.104–1(c) (1997). Furthermore, Pipitone argues that "[t]he $95,000 payment was not 'salary,' and no part thereof nor any matching company contribution was added to [his] 401k plan ...." (*Id.*) Finally, Pipitone disputes the Commissioner's assertion in its disallowance letters characterizing the $95,000 as back pay and liquidated damages under the Age Discrimination in Employment Act ("ADEA"). *See* 29 U.S.C. § 621 *et seq.*

The Government's primary argument is that Pipitone cannot meet his burden because he "cannot show that the payment at issue was received ... on account of personal injuries or sickness." (Def.'s Combined Mem. in Supp. and Resp. at 3.)[3] The Govern-

---

2. Section 61(a) states: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived." 26 U.S.C. § 61(a).

3. The court recognizes that the Government's argument departs from its prior, exclusive reliance on *Schleier* in the letters sent to Pipitone.

That departure, however, is in no way significant. *See Kincaid v. United States*, 682 F.2d 1220, 1222 n. 3 (5th Cir.1982) ("The Government may assert at the trial of a refund suit a theory not previously presented in the course of the proceedings.") (*citing Lewis*, 284 U.S. at 283, 52 S.Ct. 145). Indeed, Pipitone has had ample op-

ment asserts that the evidence shows that CNA intended the $95,000 to be severance pay rather than a settlement of any claim by Pipitone. "Severance pay" is defined as "an allowance usually based on length of service that is payable to an employee on termination of employment." Webster's Collegiate Dictionary 1078 (10th Ed.1984); *see also Webb v. Commissioner*, 71 T.C.M. (CCH) 2004 n. 3 (1996). It is undisputed that if considered severance pay, the $95,000 is taxable. *See Keel v. Commissioner*, 73 T.C.M. (CCH) 3092, 3095 (1997) ("Severance pay, just like the pay it replaces, is taxable income.").

Because no prosecution of a suit for personal injuries preceded the Agreement, the relevant question is whether the Agreement was a "settlement agreement ... in lieu of such prosecution" under Treasury Regulation 1.104(c)-1. *See Taggi v. United States*, 35 F.3d 93, 95 (2nd Cir.1994). "Where the issue is an asserted exclusion from taxable income, it is imperative that a 'settlement agreement' involve a bona fide dispute. This prevents the use of a contrived 'settlement' designed to avoid taxation of the proceeds." *Id.* (citations omitted). Accordingly, the court must determine whether the $95,000 payment was "on account of" a claim of personal injury or sickness that Pipitone had against CNA. *See Brennan*, supra (stating that "there must be some existing claim"); *Glynn v. Commissioner*, 76 T.C. 116, 119–20, 1981 WL 11320 (1981) ("The essential element of an exclusion under section 104(a)(2) is that the income involved must derive from some sort of tort claim against the payor."), *aff'd without published opinion* 676 F.2d 682 (1st Cir.1982); *see also McKim v. Commissioner*, 40 T.C.M. (CCH) 9, 12 (1980) (The taxpayer "must show the nature of the claim which was the actual basis for settlement, not the validity of the claim, [citations], the proper inquiry being: in lieu of what were damages awarded?").

Ideally, the answer to that inquiry is apparent from the text of the Agreement. Indeed, the Agreement states that it "constitutes the entire agreement and understanding between [the parties]." (Pls.' Rule

12(M) Stmt., at Ex. E., ¶ 7.) Here, however, the text of the Agreement is not conclusive. A glaring example of the Agreement's ambiguity is the clause stating that Pipitone releases "any right to severance or benefits other than that specified in the instant Agreement and any claims you have pursuant to the provisions of the [ADEA]." (*Id.*, at ¶ 2.) It is unclear whether this means that Pipitone releases any right to *any* severance pay, or whether he releases any right to severance pay *other than* that specified in the Agreement.

Further, the Agreement appears to be a severance package based upon the payment of "fifty two weeks, or $95,000, less applicable Federal, State and Local deductions" and the provision for continued insurance coverage (¶ 1). *See, e.g., McKim*, 40 T.C.M (CCH) at 13 (employer's withholding of federal and state income taxes and FICA from settlement award suggested that it was compensation rather than damages). On the other hand, the Agreement states that it is "intended solely to accomplish a settlement" (¶ 13) and includes language that Pipitone agrees not to sue CNA under federal, state or local law (¶ 3).

Yet, there is no express reference to specific claims of personal injury. That omission alone raises the presumption that the $95,000 payment was not on account of personal injury. *See Wise v. Commissioner*, 75 T.C.M. (CCH) 1514 (1998) ("[F]ailure to show the specific amount of the payment allocable to the claims of tort or tortlike damages for personal injuries results in the entire amount's being presumed not to be excludible."). And boiler-plate release clauses are not sufficient indicia of the basis for the payment. *See Elpi v. United States*, 968 F.Supp. 54, 57 (D.Conn.1997) ("[T]he reference to tort claims in a standard release form cannot serve as the basis for arguing that a tort occurred."); *Ball v. Commissioner*, 74 T.C.M. (CCH) 1370 (1997) (same); *cf. Thompson v. Commissioner*, 75 T.C.M. (CCH) 2481 (1998) (disregarding a standard release clause because it included "claims that do not fall within the ambit of section 104(a)(2)."). Therefore, the court must look

---

portunity to respond to the Government's argument in his briefs.

beyond the text of the Agreement to determine the actual basis for the $95,000 payment. *See Bagley v. Commissioner,* 121 F.3d 393, 396 (8th Cir.1997) ("[T]he language of a settlement agreement cannot always be dispositive.").

In the absence of unequivocal language in the Agreement, CNA's intent in making the payment is controlling. *See Kurowski,* 917 F.2d at 1036 ("Since the settlement agreement did not expressly state that the payment was made on account of personal injuries, the payor's intent in making the payment becomes controlling."); *see also Morabito v. Commissioner,* 74 T.C.M. (CCH) 62 (1997); *Brennan,* supra. *But see Glatthorn v. United States,* 818 F.Supp. 1548, 1551 n. 3 (S.D.Fla.1993) (stating that "the great majority of cases consider all relevant circumstances" rather than just the intent of the payor).

As evidence that CNA intended the $95,000 to be severance pay, the Government submits two internal memoranda written by Judith Samuel ("Samuel"), CNA's Vice President of Human Resources. The first memorandum, dated January 12, 1995, states, in relevant part:

The following summarizes our thoughts regarding Andy Pipitone's separation package:

Under the severance policy, Andy would receive 5 months severance. The enhanced severance package provides for 2 weeks of severance for every year of service (If the employee is over 40) which would equate to 6.5 months of severance. Due to the circumstances you outlined we would be comfortable offering 10 months severance.

In addition we generally provide notice of workforce reduction. In this case, 60 days would be reasonable. However, since we do not have meaningful work for the next 60 days we can compensate Andy for the 60 days notice.

As such, the total compensation would equal 12 months pay.

. . .

I will discuss the severance, benefit issues, vested retirement benefit and savings plan distribution with Andy as well as the Release . . . .

(Def.'s Rule 12(M), at Ex. 2.) The second memorandum, dated January 23, 1995, states:

A. Pipitone has signed a release which entitles him to 12 months severance and the continuation of his benefits . . . through January 31, 1996. Please pay additional severance due . . . .

(*Id.,* at Ex. 3.)

In addition, the Government attaches the affidavits of Samuel and CNA's Senior Vice President of Claims, Thomas E. Donnelly ("Donnelly"). (*See id.,* at Exs. 1, 4.) In their respective affidavits, Samuel and Donnelly swear that CNA intended the $95,000 to be severance pay. Each executive also declares that "[i]n arriving at the amount of the payment to Mr. Pipitone, CNA did not take into account any claim by Mr. Pipitone based on personal injury or sickness." (*Id.,* at Ex. 1, ¶ 4; Ex. 4, ¶ 3.) Furthermore, Samuel declares that she was "not aware of any formal suit, claim, or complaint ever being filed by Mr. Pipitone against CNA with any judicial or administrative body, and the records of CNA do not contain any indication that Mr. Pipitone ever asserted such claim." (*Id.,* at Ex. 1, ¶ 4.) Notably, Donnelly's affidavit does not include this statement. Nevertheless, Donnelly attests that during a meeting with Pipitone about his termination, "[a]t no time in conversation with me did Mr. Pipitone ever threaten to sue CNA or even suggest that possibility." (*Id.,* at Ex. 4, ¶ 2.) Finally, Donnelly states that "[t]here were no negotiations between Mr. Pipitone and myself over the amount of his severance payment." (*Id.,* at ¶ 4.)

In response,[4] Pipitone submits his own affidavit in which he maintains that "[o]n or

4. The court notes that Pipitone submits an affidavit in his response as an avenue to assert additional facts. This practice is not in compliance with the requirements of Local Rule 12. If the non-moving party wishes to assert additional facts in response to the movant's motion for summary judgment and accompanying Rule 12(M) statement, he must submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of sum-

around December 7, 1994, in his office, in conversation with Thomas Donnelly, I made a claim for wrongful termination, wrongful intentional conduct, slander and libel against CNA." (Pls'. Combined Mem. in Opp'n. and Reply, at Ex. B, ¶ 3.) Pipitone also avers that during this conversation he told Donnelly that he "had seen a memo regarding my being out of the organization by December 31, 1994." (*Id.*) According to Pipitone, Donnelly "acknowledged that [Pipitone] was being terminated and . . . very specifically solicited . . . a demand to settle all claims [Pipitone] had against CNA." (*Id.,* ¶ 4.) Pipitone contends that Donnelly later approached him with the $95,000 "settlement." (*Id.,* at ¶ 6.)

The court finds that Pipitone's self-serving affidavit is not enough to rebut Samuel's internal memoranda unequivocally stating that CNA intended the $95,000 to be severance pay. *See Patterson v. Chicago Assoc. for Retarded Citizens,* 150 F.3d 719, 724 (7th Cir.1998) ("It is well established that '[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment.' ") *(quoting Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993)); *cf. Kroposki v. Commissioner,* 74 T.C.M. (CCH) 1434 (1997) (statements by director of human resources supported finding of severance). The memorandum of January 15, 1995, refers to CNA's "severance policy" and states that the payment would be based upon Pipitone's years of service and would equal 12 months pay. *See Brennan,* supra (stating that payment based on years of service suggested severance pay); *Thorpe v. Commissioner,* 74 T.C.M (CCH) 219 (1997) (same). Moreover, the memorandum states that CNA would have been willing to retain Pipitone for an additional 60 days if there was meaningful work for him to complete. This suggests that CNA's motive for terminating Pipitone was not to settle claims of personal injury. Additionally, the memorandum of January 23, 1995, is consistent with the first memorandum, and it too refers to the payment as severance pay. Nowhere in either memorandum is there any mention of tort or tort-like claims or of any payments allocable to such claims.

And though Donnelly's silence on whether Pipitone had previously asserted a claim against CNA suggests that he may have done so, that does not show that the $95,000 payment was actually in lieu of a legal suit based upon tort or tort type claims. *See Gajda v. Commissioner,* 74 T.C.M. (CCH) 228 (1997) (even assuming taxpayer had a potential tortlike claim, taxpayer failed to show payment was on account of personal injury); *Hamm v. Commissioner,* 74 T.C.M. (CCH) 279 (1997) (same). Pipitone allegedly made the claim only after he had seen a memorandum discussing plans to terminate him. This uncorroborated claim made when "the handwriting was on the wall" regarding his impending termination does not support his claim for a tax refund. *See Kurowski,* 917 F.2d at 1036 (rejecting taxpayer's "after-the-fact self-serving testimony"); *Kroposki,* supra (rejecting taxpayer's testimony that he made specific claims of injury and that they were incorporated within a final settlement because the testimony "was after-the-fact, self-serving, and uncorroborated.").

Furthermore, Pipitone does not produce any documentary evidence or testimony that he had asserted claims prior to that meeting or that such claims had any validity. *See Hamm,* supra (stating that the failure to file a claim "may be taken into account in deciding whether the taxpayer released a tort or tort type claim."); *Lubart v. Commissioner,* 74 T.C.M. (CCH) 223 (1997). The former "Vice–President Claims Legal Services" does little more than ask the court to speculate about an amorphous claim and to ignore the Government's Local Rule 12 submissions. Although not dispositive, the lack of documentary evidence is significant because Pipitone states in his complaint that he had "consulted with counsel" about CNA's alleged tortious conduct during the years preceding his termination, (Compl. at ¶ 6), and he himself is an attorney.

mary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. ILL. GEN. R. 12(N)(3)(b); *see generally* Iain D. Johnston,

"Summary Judgment Motions in the Northern District, The Importance of Local Rules 12(M) & 12(N)," CBA [Chicago Bar Association] Record, Apr. 1998, at 24–29.

The burden was on Pipitone to show that there is, at minimum, a genuine issue of material fact regarding whether the $95,000 payment was on account of personal injury. Pipitone has failed to do so. Simply resting on the unsupported allegations within his pleadings does not suffice. *See Sample v. Aldi, Inc.*, 61 F.3d 544, 547 (7th Cir.1995). "[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir.1997). Because Pipitone has submitted no evidence to support his claim for a tax refund, the court enters summary judgment in favor of the Government.

### III. CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment is granted and Pipitone's motion for summary judgment is denied. Case terminated.

IT IS SO ORDERED.