T.C. Memo. 2001-55

UNITED STATES TAX COURT

TAYLOR MILLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12095-98.              Filed March 6, 2001.

<u>Patrick W. Martin</u>, for petitioner.

<u>Timothy F. Salel</u>, for respondent.

MEMORANDUM OPINION

BEGHE, <u>Judge</u>:  Respondent determined a deficiency of $75,180
in petitioner's 1992 Federal income tax.  The deficiency is
primarily attributable to respondent's determination that the
proceeds of petitioner's settlement of a sex discrimination class
action lawsuit, <u>Kraszewski v. State Farm Gen. Ins. Co.</u>, 38 Fair
Empl. Prac. Cas. (BNA) 197 (N.D. Cal. 1985), affd. in part, revd.

in part and remanded 912 F.2d 1182 (9th Cir. 1990) (the State Farm class action lawsuit), are included in her gross income.[1]

Petitioner concedes that the gross proceeds of her settlement of the State Farm class action law suit--$283,543--are not excluded from her gross income under section 104(a)(2),[2] but she attacks the validity of respondent's notice of deficiency on multiple grounds:  That respondent violated his reopening procedures, that respondent performed a second inspection of petitioner's books of account in violation of section 7605(b), and that respondent is equitably estopped from issuing the notice of deficiency.  Petitioner also claims, if the validity of the notice should be sustained, that she is entitled to deduct, as section 162 business expenses, two items she did not claim on her 1992 income tax return:  Her contribution to a private pension plan and her attorney's fees and costs in the State Farm class action lawsuit.

We sustain the validity of respondent's notice and reject petitioner's claims to the private pension plan contribution

---

[1] For a description of the State Farm class action lawsuit in the context of the claimants' income tax treatment, see Brewer v. Commissioner, T.C. Memo. 1997-542, affd. without published opinion 172 F.3d 875 (9th Cir. 1999).

[2] Unless otherwise noted, all section references are to the Internal Revenue Code in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

deduction and above-the-line treatment of the deduction for her attorney's fees and costs, which respondent allowed in the notice of deficiency as an itemized deduction subject to the 2-percent limitation of section 67.

Some of the facts have been stipulated and are so found. The stipulations of fact and accompanying exhibits are incorporated by this reference. For clarity and convenience, findings of fact and discussion with respect to the validity of respondent's notice and petitioner's deduction claims are combined under two separate headings. Monetary amounts have been rounded to the nearest whole dollar.

Petitioner resided in Poway, California, when the petition in this case was filed.

Issue 1:  Validity of Statutory Notice

During 1975, petitioner sold insurance products as an employee of Fidelity Union Life Insurance Company (Fidelity). During 1976 and 1977, petitioner operated as a sole owner and paid for the costs of operating her business as an independent insurance salesperson with Fidelity. Petitioner reported her 1976 and 1977 earnings from the sale of Fidelity insurance products on Schedule C of her 1976 and 1977 Federal income tax returns. After 1977, petitioner never again sold insurance, but worked off and on, sometimes as an employee and sometimes as an

independent contractor, in various selling jobs in, among other things, the financial products, mortgage brokerage, and real estate businesses.

In fall 1976 or January 1977, petitioner applied to become a State Farm trainee agent. As part of her job application, petitioner had a series of interviews and took a test with State Farm. Petitioner was never hired by State Farm, nor did she ever provide services for State Farm.

In 1988, petitioner applied to become a class member of the State Farm class action lawsuit and thereafter became a class member. On March 6, 1992, petitioner executed a settlement agreement and general release (settlement agreement), regarding her claim in the State Farm class action lawsuit. In the settlement agreement, petitioner and State Farm characterized the settlement as "the compromise of a claim for agent earnings"; by entering into the settlement agreement, petitioner waived "any and all right she might have * * * respecting instatement".

Petitioner received a $223,935 check from the law firm of Saperstein, Mayeda, Larkin, and Goldstein as the net proceeds of settlement of her claim in the State Farm class action lawsuit. Petitioner has stipulated that she received $283,543 as the gross proceeds of the settlement (not reduced by attorney's fees and costs) during the 1992 tax year. Of that amount, State Farm reported $283,178 on Form 1099-MISC and the remaining $425 on

Form W-2. State Farm negotiated and reported the $283,178 of settlement proceeds on Form 1099-MISC as the amount it would have paid petitioner if she had become its independent insurance agent. State Farm negotiated and reported the $425 of settlement proceeds on Form W-2 with payroll taxes properly withheld as the amount it would have paid petitioner if it had initially hired her as a trainee agent.

Petitioner timely filed her Federal income tax return, Form 1040, for the 1992 tax year with the Internal Revenue Service Center in Fresno, California. Petitioner attached to her 1992 return a Schedule C and a Form 8275 disclosure statement reporting her receipt of settlement proceeds of $1,383,118 from State Farm companies in 1992 on account of personal injuries or sickness from a "very serious auto accident and an intentional personal discrimination claim", which were excludable from gross income under section 104(a)(2). Of this total amount, petitioner received approximately $1,100,000 from State Farm Mutual Auto Insurance Company in settlement of a claim for personal injuries suffered in an auto accident. These personal injury settlement proceeds are not at issue in this case.

On October 7, 1993, respondent's District Director mailed petitioner a letter and Information Document Request (Form 4564) informing her that her 1992 income tax return had been selected for examination. On April 8, 1994, petitioner's counsel mailed

respondent a 16-page memorandum arguing that the State Farm class action lawsuit settlement proceeds received by petitioner are excluded from gross income under section 104(a)(2). On April 25, 1994, respondent mailed petitioner a "no change" form letter (Letter 590 (DO) (Rev. 4-92)) stating: "We examined your tax return for the above period and made no changes to the tax year reported." Respondent's form letter goes on to advert to the possibility of a later change in the taxpayer's tax if the taxpayer is a shareholder of an S corporation, a beneficiary of a trust, or a partner in a partnership whose return is changed on examination.

Respondent and petitioner never executed a closing agreement, pursuant to section 7121, for petitioner's 1992 tax year.

On March 29, 1995, respondent's Fresno Service Center mailed petitioner a 30-day letter regarding her alleged failure to report bartering proceeds of $2,894 on her 1992 income tax return for the 1992 tax year. The 30-day letter regarding the bartering proceeds was unrelated to the examination regarding the State Farm class action lawsuit settlement proceeds. On April 19, 1995, petitioner's representative, David W. Stevenson, C.P.A. (Stevenson), in response to this 30-day letter, mailed a letter to respondent's Fresno Service Center, attaching thereto copies of the Schedule D of petitioner's 1992 income tax return and the

front page of the 30-day letter. After receiving Stevenson's letter, respondent agreed that petitioner had properly reported $2,894 in bartering proceeds on Schedule D of her 1992 income tax return.

On September 28, 1995, respondent's District Director mailed petitioner a 30-day letter for the 1992 tax year regarding the State Farm class action lawsuit settlement proceeds. The statement of examination changes accompanying this 30-day letter proposed to treat petitioner's State Farm class action lawsuit settlement proceeds, in the amount of $283,117, as income from self-employment for the 1992 tax year, and to allow legal fees of $56,623 paid to obtain the settlement as an above-the-line Schedule C deduction. This 30-day letter proposed no adjustment related to bartering proceeds.

In November 1995, petitioner and her counsel signed a Consent to Extend the Time to Assess Tax (Form 872) that extended the period of limitations on assessment for the 1992 tax year until June 30, 1997.

On July 17, 1996, a tax technician in respondent's District Director's Office mailed petitioner's counsel a letter enclosing a revised examination report (not included in the record) deleting self-employment tax on the settlement proceeds and downgrading petitioner's legal fees from an above-the-line Schedule C deduction to a below-the-line itemized deduction. The

letter also asserted that two criteria applied in respondent's decision "to reopen Ms. Miller's case for re-examination": First, there had "been a substantial error both in amount and in relation to total tax liability" and, second, "other circumstances exist indicating that failure to reopen the case would be a serious administrative omission".

On October 2, 1996, petitioner signed another Consent to Extend the Time to Assess Tax (Form 872), which extended the period of limitations on assessment for the 1992 tax year until April 30, 1998.

On January 16, 1997, petitioner's counsel mailed respondent's Riverside, California, Appeals Office a 9-page memorandum arguing two grounds on which the no change letter should stand. The first ground was that there was no justifiable basis for reopening the case under Rev. Proc. 94-68, 1994-2 C.B. 803, and section 4023 of the Internal Revenue Manual (the Manual), which in his view were binding on the Internal Revenue Service. The second ground was that respondent had conducted a second investigation of petitioner's 1992 return, without notifying her of the need thereof, in violation of section 7605(b).

On June 16, 1997, the Chief, Examination Division, Laguna Niguel, California, mailed petitioner a letter stating, with regard to the 1992 tax year:

We are required by law to notify taxpayers in writing if we need to reexamine their books and records after previously examining them.

Because information that may affect your tax liability has been developed since we last examined your books and records, please make them available to us for reexamination.

Thank you for your cooperation.

On October 14, 1997, petitioner signed another Consent to Extend the Time to Assess Tax (Form 872), which extended the period of limitations for assessment for the 1992 tax year until December 31, 1998.

On April 9, 1998, respondent issued the notice of deficiency for the 1992 tax year to petitioner. When respondent issued the notice, the period of limitations for assessment for the 1992 tax year had not expired.

Petitioner claims she relied on respondent's April 25, 1994, no change letter for "a sense of security," but she did nothing in detrimental reliance thereon. For some years, petitioner has been her mother's primary source of support; petitioner's income tax returns for the years 1989 through 1996 claim her mother as a dependent. Commencing early in the calendar year 1998, petitioner became the primary source of support for one of her nephews.

To provide the context for respondent's change of the position evidenced by the no change letter, we make some

preliminary observations.  In 1993, when respondent notified petitioner that her 1992 return had been selected for examination, continuing through 1994, when respondent mailed petitioner the no change letter, it was respondent's stated position that a payment in satisfaction of a sex discrimination claim under Title VII of the Civil Rights Act of 1964, as amended in 1991 to provide for compensatory and punitive damages and for jury trials, was excluded from gross income as damages for "tort-like personal injury" under section 104(a)(2).  See Rev. Rul. 93-88, 1993-2 C.B. 61; see also Priv. Ltr. Rul. 94-48-014 (Aug. 30, 1994).  In taking this position, respondent relied on language in United States v. Burke, 504 U.S. 229, 234-241 (1992), which held that back-pay damages under the pre-1991 version of Title VII of the Civil Rights Act of 1964 were taxable because that version of the Act, which provided neither for damages other than backpay nor for a jury trial, did not redress a tort-like injury.

Petitioner's counsel's legal memorandum of April 8, 1994, argued that petitioner's settlement proceeds from the State Farm class action lawsuit remedied a tort-like injury and were excluded from gross income under section 104(a)(2), pursuant to Rev. Rul. 93-88 and Priv. Ltr. Rul. 94-48-014.  In issuing the no change letter, respondent apparently accepted petitioner's argument that petitioner's claim in the State Farm class action

lawsuit was governed by the 1991 amendments to the Civil Rights Act.[3]

Any uncertainty about the significance in discrimination cases of the 1991 amendments to the Civil Rights Act was laid to rest by the Supreme Court's opinion in Commissioner v. Schleier, 515 U.S. 323 (1995), published June 14, 1995.  Schleier held that awards under the Age Discrimination in Employment Act (ADEA) were taxable not only because the ADEA, like the pre-1991 version of the Civil Rights Act, does not satisfy the requirement of tort-like injury, but also because the claim must be "on account of personal injuries or sickness", and that termination on account of age could not "fairly be described as a 'personal injury' or 'sickness.'" Id. at 330.  Thus, the second ground of Schleier

---

[3] If respondent accepted petitioner's argument to this effect, relying on the holding of the Court of Appeals for the Ninth Circuit in Davis v. City of San Francisco, 976 F.2d 1536 (9th Cir. 1992) (cited by petitioner's counsel in his memo of April 8, 1994), that the provisions of the Civil Rights Act of 1991, Pub. L. 90-202, 81 Stat. 602, governing expert witness fees applied retroactively, it turned out that respondent was mistaken.  The amendments made by the Civil Rights Act of 1991, which provided for additional relief of compensatory and punitive damages as well as back pay, and for a jury trial, were subsequently held not to apply retroactively.  See Landgraf v. USI Films Prods., 511 U.S. 244, 249, 256, 286 (1994).  Thus, respondent should have considered petitioner's claim in the light of the pre-1991 version of the Act under which she made claim, which arose in 1977.  See Clark v. Commissioner, T.C. Memo. 1997-156.  Since United States v. Burke, 504 U.S. 229 (1992), held that sec. 104(a)(2) did not apply to a settlement award under Title VII of the 1964 Act, Burke was governing authority for inclusion of petitioner's settlement in gross income.

supports the proposition that back wages for what might be regarded as a tort-like injury, e.g. discrimination on account of age, race, disability, or sex, are taxable unless it can be shown that (a) the discrimination caused physical or psychological injury, and (b) the loss of pay was due to a physical or psychological injury, not just the discriminatory action of the employer.[4]

Schleier became the law of the land applicable to all pending cases. When the U.S. Supreme Court announces a rule of law and applies it to the litigants in the case announcing the rule, that rule applies retroactively to all other pending cases unless barred by the statute of limitations or res judicata. See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97 (1993); James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 540-541, 544 (1991). Consistently with this view, the Tax Court has applied Schleier to taxable years antedating the Supreme Court's opinion therein. See, e.g., Bagley v. Commissioner, 105 T.C. 396 (1995), affd. 121 F.3d 393 (8th Cir. 1997); Green v. Commissioner, T.C. Memo. 1998-274; Goeden v. Commissioner, T.C. Memo. 1998-18; Wise v. Commissioner, T.C. Memo. 1998-4; Kroposki

---

[4] It is noteworthy that the Supreme Court in Schleier v. Commissioner, 515 U.S. 323, 336 n. 8 (1995) cast doubt on the Commissioner's reading of United States v. Burke, supra, in Rev. Rul. 93-88, 1993-2 C.B. 61. In Notice 95-45, 1995-2 C.B. 330, the Commissioner suspended Rev. Rul. 93-88; in Rev. Rul. 96-65, 1996-2 C.B. 6, the Commissioner obsoleted Rev. Rul. 93-88.

v. Commissioner, T.C. Memo. 1997-563; Moran v. Commissioner, T.C. Memo. 1997-412; Fredrickson v. Commissioner, T.C. Memo. 1997-125.

The Tax Court has also invariably held that recipients of settlement proceeds from the State Farm class action lawsuit are required to include the proceeds in gross income.  See, e.g., Westmiller v. Commissioner, T.C. Memo. 1998-140; Reiher v. Commissioner, T.C. Memo. 1998-75; Easter v. Commissioner, T.C. Memo. 1998-8; Brewer v. Commissioner, T.C. Memo. 1997-542, affd. without published opinion 172 F.3d 875 (9th Cir. 1999); Gillette v. Commissioner, T.C. Memo. 1997-301; Hayes v. Commissioner, T.C. Memo. 1997-213; Hardin v. Commissioner, T.C. Memo. 1997-202; Raney v. Commissioner, T.C. Memo. 1997-200; Clark v. Commissioner, T.C. Memo. 1997-156; Berst v. Commissioner, T.C. Memo. 1997-137; Martinez v. Commissioner, T.C. Memo. 1997-126, affd. without published opinion 83 AFTR 2d 99-362, 99-1 USTC par. 50,168 (9th Cir. 1998); Fredrickson v. Commissioner, supra.

Approximately 3 months after the Supreme Court's opinion in Schleier, respondent mailed petitioner the 30-day letter of September 28, 1995, which proposed that the proceeds of her settlement of the State Farm class action lawsuit be included in her gross income.  Thereafter, petitioner signed a series of consents extending the period of limitations on assessment for the 1992 tax year; in due course, in 1998, respondent issued the notice, which embodies respondent's determination to give effect

to the proposal in respondent's 30-day letter of September 28, 1995.

Before turning to petitioner's three arguments that respondent's statutory notice is invalid, we recite some events in the administrative history of the case noted by the parties in making their arguments.

Before mailing the 30-day letter of September 28, 1995, in which respondent first proposed, after mailing petitioner the no change letter, that the State Farm class action lawsuit settlement proceeds should be included in her gross income, respondent issued a 30-day letter, on March 29, 1995, to the effect that she had failed to include $2,894 of bartering proceeds in her 1992 return.  Petitioner's representative resolved that issue simply by sending respondent a copy of the Schedule D on which the bartering proceeds were reported. Petitioner now claims that respondent's raising of the bartering proceeds issue was a prohibited second examination without petitioner's consent in violation of section 7605(b).

On July 17, 1996, after the 30-day letter of September 28, 1995, and the parties' execution of the first consent extending the period of limitations, a tax technician in respondent's District Director's Office mailed petitioner's attorney a letter that on balance was more unfavorable to petitioner than the 30-day letter:  Although the new letter said the recovery was not

subject to self-employment tax, it downgraded her attorney's fees from an above-the-line Schedule C deduction to a below-the-line itemized deduction, which increased her adjusted gross income and limited her available exemptions. The letter also recited the two criteria justifying respondent's change of the position evidenced by the no change letter.

In response to petitioner's counsel's second memo of January 16, 1997, arguing that neither of those criteria had been satisfied and that petitioner had not been notified of the need for a second examination, respondent's Chief, Examination Division, on June 16, 1997, mailed petitioner a letter belatedly acknowledging that "We are required by law to notify taxpayers in writing if we need to reexamine their books and records after previously examining them" and asking petitioner to "please make them available to us for examination". There is no evidence in the record that respondent ever actually reexamined petitioner's records or requested any additional documentation from petitioner regarding the State Farm class action lawsuit settlement proceeds.

Although there may be some interrelationships among petitioner's arguments that the notice should be invalidated on account of respondent's asserted failure to follow his reopening procedures, respondent's asserted violation of section 7605(b), and petitioner's claim of equitable estoppel, see Saltzman, IRS

Practice and Procedure 8-42 (2d ed. 1991), we follow the lead of the parties and address these arguments under separate subheadings.

    a. <u>Respondent's Asserted Failure To Follow Reopening Procedures</u>

Respondent's procedural rules for reopening cases closed after examination to make an adjustment unfavorable to the taxpayer are set forth in the latest of a long line of revenue procedures, Rev. Proc. 94-68, 1994-2 C.B. 803, and in section 4023 of the Manual.

The Service's policy is not to reopen a closed case to make an adjustment unfavorable to the taxpayer unless

> (1) there is evidence of fraud, malfeasance, collusion, concealment, or misrepresentation of a material fact;
> (2) the prior closing involved a clearly defined substantial error based on an established Service position existing at the time of the previous examination; or
> (3) other circumstances exist that indicate failure to reopen would be a serious administrative omission.  [1 Audit, Internal Revenue Manual (CCH), sec. 4023.2 (Reopening Requirements), at 7063-7064.][5]

The revenue procedure and the Manual clarify the reopening procedures.  The closing of a case by the Service is evidenced, among other things, by issuance of a no change letter to the taxpayer.  See Rev. Proc. 94-68, sec. 4.01(1), 1994-2 C.B. 803; 1

---

[5]  Rev. Proc. 94-68, sec. 5.01 (Policy), 1994-2 C.B. at 804, is virtually identical.

Audit, Internal Revenue Manual (CCH), sec. 4023.4, at 7064-7065.
A no change letter is not a closing agreement under section 7121.
See sec. 301.7121-1(d), Proced & Admin. Regs.

      i. <u>Violation of Respondent's Reopening Procedures Does Not Invalidate a Notice of Deficiency</u>.

In the face of hornbook law that respondent's procedural rules, including the reopening procedures under Rev. Proc. 94-68 and section 4023.2 of the Manual, <u>supra</u>, are merely directory, not mandatory, see <u>Collins v. Commissioner</u>, 61 T.C. 693, 700-701 (1974), and that compliance with directory procedural rules is not essential to the validity of a statutory notice, so that an alleged violation of these rules provides no basis for invalidating a statutory notice of deficiency, <u>id.</u>, petitioner cites <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281 (1979), for the proposition that respondent's reopening procedures in Rev. Proc. 94-68, 1994-2 C.B. 803, should have "the force and effect of law".

<u>Chrysler Corp. v. Brown</u>, 441 U.S. at 302 (quoting <u>Morton v. Ruiz</u>, 415 U.S. 199, 232, 235, 236 (1974)), establishes that a regulation or procedure has the force and effect of law when it is promulgated by an agency as a "'substantive rule'" or a "'legislative-type rule'" pursuant to a mandate or delegation by Congress "'affecting individual rights or obligations.'" Conversely, "interpretive rules, general statements of policy, or

rules of agency organization, procedure, or practice" are not binding upon the agency.  <u>Id.</u> at 301.  Courts have long recognized the distinction between mandatory procedures, which are binding on the agency, and directory procedures, which are not.  See <u>Cleveland Trust Co. v. United States</u>, 421 F.2d 475 (6th Cir. 1970); <u>Geurkink v. United States</u>, 354 F.2d 629 (7th Cir. 1965); <u>Luhring v. Glotzbach</u>, 304 F.2d 560 (4th Cir. 1962); <u>Collins v. Commissioner</u>, <u>supra</u>; <u>Notaro v. United States</u>, 71 AFTR 2d 93-659, 93-1 USTC par. 50,030 (N.D. Ill. 1992); <u>First Fed. Sav. & Loan Association v. Goldman</u>, 58 AFTR 2d 86-5612, 86-2 USTC par. 9624 (W.D. Pa. 1986).

We are satisfied under the weight of authority that we need not reexamine the well-established law to this effect.  However, for purposes of completeness, we do address petitioner's argument that respondent violated respondent's own reopening procedures, so as to demonstrate the inapplicability of any isolated cases in which the Commissioner's notice was arguably held invalid for failure to follow his own reopening procedures.  See, e.g., <u>Estate of Michael ex rel. Michael v. Lullo</u>, 173 F.3d 503 (4th Cir. 1999).  We conclude that in the case at hand respondent satisfied at least one of the criteria under his procedures for reopening a closed case.

ii. Respondent Did Not Violate His Reopening Procedures in Reopening Petitioner's 1992 Tax Year.

Whether respondent was justified under Rev. Proc. 94-68 and section 4023 of the Manual, supra, in reopening petitioner's "closed" case would depend upon whether respondent's original position (1) was attributable to taxpayer or Service misconduct, (2) constituted "substantial error," or (3) whether respondent's failure to change the position would have constituted "a serious administrative omission".  Satisfaction of any of these three tests would justify reopening under the Service's own policy pronouncements.  See supra p. 16.

We focus on the third test, whether "failure to reopen would" have been "a serious administrative omission."  Reopening because of a "serious administrative omission" covers situations in which a failure to reopen could:

> (1) result in serious criticism of the Service's administration of the tax laws;
> (2) establish a precedent that would seriously hamper subsequent attempts by the Service to take corrective action;
> (3) result in inconsistent treatment of similarly situated taxpayers who have relatively free access to knowledge as to how the Service treated items on other taxpayers' returns.  [1 Audit, Internal Revenue Manual (CCH), sec. 4023.5, at 7065.]

With regard to "serious administrative omission", we conclude that respondent is on firm ground.  Whatever doubt there might have been about the clarity of respondent's established position in 1994, those doubts were laid to rest and the position

clarified in mid-1995 by the Supreme Court's opinion in

Commissioner v. Schleier, 515 U.S. 323 (1995). Petitioner

acknowledges that the State Farm class action lawsuit settlement

proceeds constitute gross income, and we are satisfied that

respondent was authorized to pursue all recipients of such

proceeds, including petitioner, for all open years. For

respondent not to have done so might well have resulted "in

serious criticism of the Service's administration of the tax

laws" and would have resulted "in inconsistent treatment of

similarly situated taxpayers", thereby satisfying the first and

third criteria for application of the "serious administrative

omission" test. Petitioner's anecdotal testimony that some

members of the class got away with noninclusion of their

settlement proceeds because respondent failed to pursue them does

not change our conclusion that the third test was satisfied.

Section 4023.5 of the Manual, in its "Definition of

Reopening Criteria", contains neither the conjunction "and" nor

the disjunctive connector "or" between the second and third

criteria. 1 Audit, Internal Revenue Manual (CCH), sec. 4023.5,

at 7065. We are satisfied that the three criteria are to be

interpreted and applied as setting forth their requirements in

the disjunctive. What this means is that the satisfying of any

one of the three criteria suffices to satisfy respondent's

"serious administrative omission" reopening test. Inasmuch as at

least one of the criteria for a "serious administrative omission" was satisfied, respondent's self-imposed stated conditions for reopening petitioner's 1992 tax case were satisfied.

b. Second Inspection

Section 7605(b) provides:

> No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

The purpose of section 7605(b) is not to limit the number of examinations, but to shift the discretion for a reexamination of the taxpayer's books to higher management personnel from the field agent; this serves "to emphasize the responsibility of agents to exercise prudent judgment in wielding the extensive powers granted to them by the Internal Revenue Code." United States v. Powell, 379 U.S. 48, 56 (1964). Section 7605(b) was not meant to restrict the scope of respondent's legitimate power to protect the revenue. See id. Section 7605(b) is not to be read so broadly as to defeat the powers granted to respondent to examine the correctness of a taxpayer's return. See De Masters v. Arend, 313 F.2d 79, 87 (9th Cir. 1963).

There is no evidence in the record of a second inspection as contemplated by section 7605(b), irrespective of whether petitioner is arguing that respondent's reopening of the

treatment of the State Farm class action lawsuit settlement proceeds or the raising of the bartering proceeds issue was a prohibited second inspection. A second inspection would require, at a minimum, that respondent have access to and physically view petitioner's books and records for the 1992 tax year. See Benjamin v. Commissioner, 66 T.C. 1084, 1098 (1976), affd. on other grounds 592 F.2d 1259 (5th Cir. 1979).

Petitioner argued, in her counsel's memo of January 16, 1997, that respondent had failed to notify her in writing of the need for a second inspection. Respondent, through the Chief, Examination Division, belatedly responded, in respondent's letter of June 16, 1997, reciting the section 7605(b) requirements and asking petitioner to "please make [her books and records] available to us for examination." Respondent's response was wholly unnecessary. There is no evidence in the record that respondent actually reexamined petitioner's records or requested or received any additional documentation from petitioner regarding the State Farm class action lawsuit settlement proceeds after issuance of the no change letter.

Apparently recognizing the weakness of her original position on the issue, petitioner on the day of trial chose to rely on respondent's inquiry raising the bartering proceeds issue as the prohibited second examination. On this score, petitioner fares no better. In resolving the bartering proceeds issue, respondent

merely reviewed Schedule D of petitioner's 1992 income tax return and the letter from petitioner's representative.  Respondent's review of a taxpayer's income tax return and accompanying schedules does not constitute a second inspection of the taxpayer's books of account under section 7605(b).  See Curtis v. Commissioner, 84 T.C. 1349, 1351 (1985); Pleasanton Gravel Co. v. Commissioner, 64 T.C. 510, 528 (1975), affd. per curiam 578 F.2d 827 (9th Cir. 1978).  Since there was no second inspection or examination, respondent's inquiry, following the no change letter, into the bartering proceeds issue without a prior written justification did not violate section 7605(b).  See Digby v. Commissioner, 103 T.C. 441, 451 (1994).

Even if respondent should be deemed to have performed a second inspection in raising the bartering proceeds issue, it was done with the knowledge of petitioner, who raised no objection thereto prior to the morning of trial.  Consequently, petitioner waived the requirement of written notice prior to a second inspection.  See Rife v. Commissioner, 41 T.C. 732, 747 (1964), affd. on this issue 356 F.2d 883 (5th Cir. 1966); Rice v. Commissioner, T.C. Memo. 1994-204.

Moreover, even if respondent should be deemed to have performed a second inspection on the bartering proceeds issue without prior notification that petitioner did not waive, invalidation of the notice of deficiency would not be the proper

remedy.  No remedy would be warranted.  There was no adjustment in the deficiency notice related to the bartering proceeds issue; petitioner suffered no injury as a result of the alleged violation of section 7605(b).  See Rice v. Commissioner, supra at note 11 and cases cited therein.

    c. Respondent Is Not Equitably Estopped From Issuing the Notice of Deficiency.

"Equitable estoppel is a judicial doctrine that 'precludes a party from denying his own acts or representations which induced another to act to his detriment.'"  Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992) (quoting Graff v. Commissioner, 74 T.C. 743, 761 (1980), affd. 673 F.2d 784 (5th Cir. 1982)).  The traditional elements of equitable estoppel--all of which must be satisfied to invoke the doctrine--are:  (1) A false representation or misleading silence by the party against whom the doctrine is to be invoked; (2) an error in a statement of fact and not an opinion or statement of law; (3) ignorance of the fact by the representee; (4) reasonable reliance on the act or statement by the representee; and (5) detriment to the representee.  See Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995), affd. 140 F.3d 240 (4th Cir. 1998).

Equitable estoppel may not be asserted against the Government "'on the same terms as any other litigant'".  United States v. Hatcher, 922 F.2d 1402, 1410 (9th Cir. 1991) (quoting

Heckler v. Community Health Servs., 467 U.S. 51, 60 (1984)).  The doctrine of equitable estoppel is applied against respondent "with utmost caution and restraint."  Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962), affg. 32 T.C. 998 (1959), affg. in part and revg. in part First W. Bank & Trust Co. v. Commissioner, 32 T.C. 1017 (1959).  Estoppel may be successfully invoked against the Commissioner only where a taxpayer would otherwise sustain such a "profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair play, that the Commissioner not be allowed to inflict the injury."  Id.  This rarely happens; the policy in favor of the efficient collection of public revenue usually outweighs the customary policy considerations that justify invocation of equitable estoppel as between private litigants.  See id.

In addition to the traditional elements of equitable estoppel, the Court of Appeals for the Ninth Circuit requires the party seeking to apply the doctrine against the Government to prove affirmative misconduct.  See Purcell v. United States, 1 F.3d 932, 939 (9th Cir. 1993), and cases cited.  The aggrieved party must prove "'affirmative misconduct going beyond mere negligence'" and, even then, "'estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of

the liability.'" Purer v. United States, 872 F.2d 277, 278 (9th Cir. 1989) (quoting Wagner v. Director, Fed. Emergency Mgmt. Agency, 847 F.2d 515, 519 (9th Cir. 1988)). Affirmative misconduct requires "ongoing active misrepresentations" or a "pervasive pattern of false promises," as opposed to an isolated act of providing misinformation. Watkins v. United States Army, 875 F.2d 699, 708 (9th Cir. 1989). Affirmative misconduct is a threshold issue to be decided before determining whether the traditional elements of equitable estoppel are present. See Purcell v. United States, supra at 939.

Before beginning the inquiry into whether the no change letter satisfied the conditions for invoking equitable estoppel against respondent, we must isolate and characterize the representation, if any, made by the no change letter. The letter says two things: "We examined your * * * return * * * and made no changes to the tax year reported", and it alerts the taxpayer to the possibility of a later change if the Service makes a change on examination of an S corporation, trust, or partnership of which the taxpayer is a shareholder, beneficiary, or partner. The letter thereby creates an impression that the return will not be changed in any other circumstances, but this is more a possible inference from silence than an affirmative representation. In this respect, the letter is different from the estate tax closing letters that were considered in Estate of

Michael ex rel. Michael v. Lullo, 173 F.3d 503 (4th Cir. 1999);
Trust Servs. of Am. v. United States, 885 F.2d 561 (9th Cir.
1989); Estate of Brocato v. Commissioner, T.C. Memo. 1999-424;
Law v. United States, 51 AFTR 2d 1343, 83-1 USTC par. 13,514
(N.D. Cal. 1982).  The format of the estate tax closing letter,
as described or quoted in these cases, is to state that the
estate tax return has either been accepted as filed or after
adjustment to which the taxpayer agreed, to recite that the
letter is not a closing agreement under section 7121, and to
state that "we will not reopen this case" unless the three-prong
test set forth in the revenue procedure currently in effect is
satisfied, either by quoting the test or citing the revenue
procedure.

Petitioner fails to satisfy the strict standard for
equitable estoppel against the Government for at least three
reasons.  First, as a threshold matter, there is no evidence of
ongoing active misrepresentations, a pervasive pattern of false
promises, or any affirmative misconduct by respondent.  See Purer
v. United States, supra at 278.

Second, however the statements in the no change letter might
be characterized, petitioner has not demonstrated reliance on the
no change letter in changing her behavior to her detriment.  In
order to satisfy the requirement of reliance, petitioner must
show that she changed her behavior as a result of the alleged

misrepresentation.  See <u>Heckler v. Community Health Servs.</u>, 467 U.S. 51, 61 (1984).  While petitioner claims that she relied on the no change letter for "a sense of security", there is no evidence that she changed her behavior or did anything in reliance on the no change letter, much less that she did anything to her detriment.  See <u>Keaton v. Commissioner</u>, T.C. Memo. 1993-365; <u>Nadler v. Commissioner</u>, T.C. Memo. 1992-383.

Petitioner's claims that she relied on the no change letter in continuing to save her investments, and in continuing to care for her mother, do not hold water.  Petitioner continued to save her investments and care for her mother after she received the no change letter in the same ways she did before she received it.  Petitioner's continued behavior does not establish the change in position that petitioner must establish in order to prove reliance.  See <u>Heckler v. Community Health Servs.</u>, <u>supra</u> at 61.

Petitioner also claims that petitioner relied on the no change letter in deciding to take custody of her nephew shortly before June 1998.  However, before petitioner took custody of her nephew, she had signed consents extending the period of limitations on assessment on November 4, 1995, on October 2, 1996, and on October 14, 1997.  Petitioner took custody of her nephew shortly after respondent issued the notice of deficiency for this case on April 9, 1998.  Since petitioner was aware of the pending examination of her income tax return for 1992, and

had already received the notice when she accepted custody of her nephew, petitioner's claim of reliance on the no change letter is not credible. See Levin v. Commissioner, T.C. Memo. 1990-226 (taxpayer who executed two extensions of the period of limitations did not establish reliance on a closing document).

Third, any reliance on the no change letter was not reasonable. A no change letter, as distinguished from a closing agreement under section 7121, does not resolve a tax controversy with finality. See Opine Timber Co. v. Commissioner, 64 T.C. 700, 712-713 (1975), affd. without published opinion 552 F.2d 368 (5th Cir, 1977); Kiourtsis v. Commissioner, T.C. Memo. 1996-534; Fitzpatrick v. Commissioner, T.C. Memo. 1995-548. Even after she received the no change letter, petitioner was aware that the 1992 tax year remained open. Petitioner signed three consents to extend the time to assess tax (Form 872). The period of limitations on assessment for the 1992 tax year had not expired at the time respondent issued the notice of deficiency in this case. Accordingly, even if petitioner did rely on the no change letter, her reliance was not reasonable.

We deny petitioner's claim for the application of equitable estoppel against respondent to invalidate the statutory notice.

Issue 2: Amount and Character of Allowable Deductions

The validity of respondent's statutory notice having been upheld, the conclusion follows, as petitioner concedes, that the

proceeds of settlement of her claim in the State Farm class action lawsuit must be included in her 1992 gross income. We are therefore faced with petitioner's alternative arguments that she is entitled to a substantial deduction in arriving at her 1992 taxable income for her contributions to the TJM pension plan and that her attorney's fees are an above-the-line Schedule C deduction rather than an itemized deduction subject to the 2-percent floor of section 67. These two arguments have a common thread, that petitioner should be allowed to treat her settlement recovery as if it were earnings from rendering services as an independent contractor insurance agent for State Farm.

a. Deduction Disallowed for Private Pension Plan
   Contributions

On October 30, 1992, petitioner adopted the Taylor J. Miller Defined Benefit Pension Plan (TJM Pension Plan).

According to the adoption agreement, petitioner adopted and sponsored the TJM Pension Plan as a sole proprietorship in her own name. Petitioner did not operate a sole proprietorship during 1992 or 1993.

The Adoption Agreement for the TJM Pension Plan selected November 1, 1991, as the effective date and defined the term "plan year" as the fiscal period ending on October 31 of each calendar year.

The TJM Pension Plan was a volume-submitter plan known as the Harrigan, Ruff, Ryder & Sbardellati Master Defined Benefit Pension Plan and Trust Agreement. On April 12, 1994, respondent issued an opinion letter that the Harrigan, Ruff, Ryder & Sbardellati Master Defined Benefit Pension Plan and Trust Agreement documents satisfied the requirements of the Internal Revenue Code (without opining on the qualified status of individual plans using the document).

In 1995, petitioner applied for a determination letter for the TJM Pension Plan. On February 8, 1996, respondent mailed petitioner a favorable determination letter that the TJM Pension Plan was qualified under section 401.

Petitioner retained an enrolled actuary, Stephen L. Hawkins, to prepare the Actuarial Information (Schedule B, Form 5500) for the TJM Pension Plan for the plan years ending October 31, 1992, and October 31, 1993.

The first plan year for the TJM Pension Plan ended October 31, 1992. Petitioner submitted TJM Pension Plan's Annual Return of Fiduciary of Employee Benefit Trust (Schedule P Form 5500), the Return/Report of Employee Benefit Plan (Form 5500-C/R), the Actuarial Information (Schedule B, Form 5500), and the Application for Extension of Time To File Certain Employee Plan Returns for the plan fiscal year ending October 31, 1992. On the Return/Report of Employee Benefit Plan (Form 5500-C/R),

petitioner used business code No. 8999, meaning "other services not classified."

The second plan year for the TJM Pension Plan ended October 31, 1993. At trial, petitioner submitted the TJM Pension Plan's Annual Return of Fiduciary of Employee Benefit Trust (Schedule P, Form 5500), the Return/Report of Employee Benefit Plan (Form 5500-C/R), the Actuarial Information (Schedule B, Form 5500), and the Application for Extension of Time To File Certain Employee Plan Returns for the plan fiscal year ending October 31, 1993.

Petitioner made the following deposits into a trust bank account at Wells Fargo Bank titled in the name of Taylor J. Miller, Trustee, Taylor J. Miller Defined Benefit Pension Plan (TJM Pension Plan Account):

| Date | Amount |
| --- | --- |
| December 31, 1992 | $ 2,500 |
| January 8, 1993 | 88,594 |
| | 91,094 |

On January 8, 1993, petitioner transferred $85,000 from the TJM Pension Plan Account to Jack White & Company. Schedule B for the plan year ending October 31, 1992, showed that petitioner made the following contributions to the TJM Pension Plan:

| Date | Amount |
| --- | --- |
| December 31, 1992 | $ 2,500 |
| January 8, 1993 | 38,229 |
| | 40,729 |

Based on the plan provisions and assumptions used by the actuary for the TJM Pension Plan plan year ending October 31,

1992, the full funding limitation under sections 412 and 404 was $40,729. For purposes of this case, under section 404(a)(1)(A)(i), the full funding limitation would result in a maximum deductible contribution of $40,729 for the plan year ending October 31, 1992.

Schedule B for the plan year ending October 31, 1993, showed that petitioner made the following contribution to the TJM Pension Plan:

| Date | Amount |
|------|--------|
| January 8, 1993 | $50,365 |

Based on the plan provisions and assumptions used by the actuary for the TJM Pension Plan plan year ending October 31, 1993, the full funding limitation under sections 412 and 404 was $52,443. For purposes of this case, under section 404(a)(1) (A)(i) and section 1.404(a)-14(c), Income Tax Regs., the full funding limitation would result in a maximum deductible contribution of $52,443 for the plan year ending October 31, 1993.

During 1975, petitioner earned $12,895 in wages from Fidelity; petitioner earned no self-employment income. During 1976 and 1977, respectively, petitioner earned $4,849 and $1,059 in net self-employment income from sales of Fidelity insurance products. Petitioner had no self-employment income for the 1989 tax year. For the 1990 and 1991 tax years, petitioner reported

net losses from self-employment on Schedule C of $4,769 and $3,981, respectively.

The only receipts that petitioner reported on Schedule C of her 1992 income tax return were the settlement proceeds of her auto accident personal injury claim and the settlement proceeds of the State Farm class action lawsuit. She lumped these together and reported the sum as subject to "exclusion under section 104(a)(2) (see 8275)". On her 1992 income tax return, petitioner reported her occupation as "Investor".

Petitioner earned no income from self-employment for the 1993, 1994, and 1995 tax years. On her income tax returns for these years, petitioner reported her occupation as "Investor".

On the Schedule C to her 1996 income tax return, petitioner reported a $5,364 net loss from self-employment; she reported her occupation as "Investor".

At no time did petitioner perform services for State Farm. Petitioner did not work in the insurance industry after 1977. Petitioner did not claim any deduction for contributions to a pension plan on her income tax return for the 1992 tax year.

In her petition, filed with this Court on July 7, 1998, petitioner raised the issue of the deductibility of her pension plan contributions for the first time. In her petition, petitioner claimed a deduction for her 1992 tax year for $91,094 in total contributions to the TJM Pension Plan. The $91,094 in

total contributions consists of $40,729 in contributions for the plan year ending October 31, 1992, and a $50,365 contribution for the plan year ending October 31, 1993. Petitioner concedes, if we should hold that she had earned income in 1992 in respect of which she could make a deductible contribution to the TJM Pension Plan, that the contribution deduction would be limited to a lesser amount as calculated under section 1.404(a)-14(c), Income Tax Regs.

The TJM Pension Plan was not in effect for the 1991 tax year because petitioner did not have a written plan and trust in existence in 1991. The TJM Pension Plan continues to remain in effect, although petitioner has not made any subsequent contributions to the trust under the plan.

A self-employed taxpayer may be entitled to deduct from income her contributions to a qualified plan, provided that the deduction does not exceed the earned income derived from the taxpayer's trade or business with respect to which the plan is established. See secs. 401(c), 404(a)(1), and (a)(8). "Earned income" is defined in section 401(c)(2)(A), which states in relevant part: "The term 'earned income' means the net earnings from self-employment (as defined in section 1402(a)), but such net earnings shall be determined * * * only with respect to a trade or business in which <u>personal services of the taxpayer are</u>

a material income-producing factor." Sec. 401(c)(2)(A) (emphasis added).

Petitioner seeks to deduct her contributions to the TJM Pension Plan on the ground that the settlement proceeds of the State Farm class action lawsuit should be characterized as earned income from self-employment.

Petitioner argues that the definition of net earnings from self-employment should be broadly construed, citing Wuebker v. Commissioner, 110 T.C. 431 (1998), particularly with regard to insurance agents, citing Jackson v. Commissioner, 108 T.C. 130 (1997), and Schelble v. Commissioner, 130 F.3d 1388 (10th Cir. 1997), affg. T.C. Memo. 1996-269. Although Wuebker and Jackson did not hold in favor of inclusion, Schelble did, and there are other cases that lend support to the traditional justification for a broad approach to promote the inclusion of self-employed individuals in the Social Security system and to finance Social Security benefits to be paid to them. See, e.g., Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994).

In support of the application of the "origin of the claim" test to hold that the settlement proceeds qualify as earnings from self-employment, petitioner also cites Dye v. United States, 121 F.3d 1399, 1404 (10th Cir. 1997), which quoted the District Court as follows:

the object of the "origin of the claim" test is to find the transaction or activity from which the taxable event proximately resulted, <u>United States v. Gilmore</u>, 372 U.S. 39, 47, * * * (1963), or the event that "led to the tax dispute." <u>Keller St. Dev. Co. v. Commissioner</u>, 688 F.2d 681 (9th Cir. 1982). The origin is determined by analyzing the facts and determining what the nature of the transaction is. <u>Keller</u>, 688 F.2d at 681.

Although petitioner in the agreement settling her claim in the State Farm class action lawsuit waived all rights to be hired by State Farm, the agreement characterized the settlement as "the compromise of a claim for agent earnings." Petitioner cites <u>McKay v. Commissioner</u>, 102 T.C. 465 (1994), vacated and remanded in an unpublished opinion 84 F.3d 433 (5th Cir. 1996); <u>Metzger v. Commissioner</u>, 88 T.C. 834 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); and <u>Yates Indus., Inc. v. Commissioner</u>, 58 T.C. 961 (1972), for the propositions that this Court, in making its facts and circumstances analysis of the origin of a claim, not only gives great deference to the terms of a settlement negotiated at arm's length, but that in these cases "this Court determined that the parties [sic] specific allocation of the settlement proceeds should be respected as it accurately reflected the origin of the claim and the settlement of those proceeds."

We have here some tensions between the initial positions of Congress and the Commissioner, restricting the availability of qualified plans for the self-employed because of the tax shelter

they can provide for highly compensated individuals, such as physicians and lawyers,[6] with petitioner's reminder that the Court has more recently recognized that highly compensated self-employed individuals are entitled to use such plans, including properly structured defined benefit plans, to shelter their earned income and provide for retirement within the limits established by Congress.  See Vinson & Elkins v. Commissioner, 99 T.C. 9 (1992).  Petitioner couples her reminder with the argument that, as a victim of invidious discrimination that prevented her from achieving an independent contractor relationship in the insurance industry, she should be allowed to treat her compensatory recovery as self-employment income and thereby shelter a portion of the recovery by making deductible contributions to her qualified plan.  Cf. Sager & Cohen, "How the

---

[6] See Staff of the Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, at 301-308 (J. Comm. Print 1982), setting forth the various restrictions in prior statutory law on qualified plans for the self-employed.  See also Bittker & Lokken, Federal Taxation of Income, Estates and Gifts S90-4-S90-5 (Cum. Supp. No. 2, 2000) for a brief summary, with citations to relevant authorities, of the Commissioner's efforts to limit the use by the erstwhile self-employed of professional corporations as vehicles to obtain the tax benefits of qualified pension and profit-sharing plans.

Income Tax Undermines Civil Rights Law", Tax Notes 1643
(Sept. 25, 2000).

Unfortunately for petitioner, the governing statutory
language does not allow us to disregard its plain meaning.  The
problem with petitioner's arguments and authorities is that they
derive no support from and indeed are contradicted by the
statutory and regulatory language as construed by the Tax Court.

Section 1.401-10(c)(1), Income Tax Regs., interprets "earned
income," as used in section 401(c)(2)(A), quoted supra p. 35, and
section 1402(a).  The regulation provides that an individual who
renders no personal services has no "earned income" even though
such an individual may have net earnings from self-employment
from a trade or business.  Earned income includes professional
fees and other amounts received as compensation for personal
services "actually rendered" by the individual.  Id.
Accordingly, if a self-employed taxpayer has not rendered
personal services in the trade or business for which a plan is
established, then the taxpayer has no earned income and is not
entitled to deduct contributions to the plan.  See S. Rept. 992,
87th Cong., 1st Sess. 12 (1961), 1962-3 C.B. 303, 314 ("the
measuring rod for deductible contributions for self-employed
* * * [taxpayers] is 'earned income' * * *.  This means that
contributions by or for a proprietor or partner may be made under

a qualified retirement plan only if he performs personal services").

We have found no case in which a person's desire, willingness, or intent to render personal services satisfied the earned income requirement.  Instead, we have upheld the requirement that personal services be actually performed in order to yield earned income that will support a deduction under section 404.

In Kramer v. Commissioner, 80 T.C. 768 (1983), Jack Kramer, a former U.S. tennis champion, received royalty payments from Wilson Sporting Goods, a tennis racquet manufacturer, which were attributed to the use of his name and reputation, and for services actually rendered in promoting Wilson's premier tennis racquet, which bore his name.  We made an allocation between the royalties paid for the use of Kramer's name and reputation, which were not earned income, and royalties paid for promotional services actually rendered on Wilson's behalf, which were earned income.  We held that, to the extent the royalties did not qualify as earned income, Kramer was not entitled to take them into account in computing his deductible contributions to his Keogh plan.

Similarly, in Frick v. Commissioner, T.C. Memo. 1983-733, affd. without published opinion 774 F.2d 1168 (7th Cir. 1985), the Court denied Mr. Frick's claimed Keogh plan contribution

deduction to the extent his contributions were from investment income.  This was because the investment income was not derived from personal services.  In so ruling, we quoted the legislative history of section 401(c), which states:  "Since the objective of * * * [a qualified plan for the self-employed] is to provide retirement benefits based on personal services, inactive owners who derive their income entirely from investments would not be allowed to participate."  S. Rept. 992, 87th Cong., 1st Sess. 12 (1961), 1962-3 C.B. 303, 314; see also Frick v. Commissioner, T.C. Memo. 1985-542, affd. without published opinion 808 F.2d 837 (7th Cir. 1986); Frick v. Commissioner, T.C. Memo. 1989-86, affd. without published opinion 916 F.2d 715 (7th Cir. 1990).

In the case at hand, petitioner applied to become a State Farm trainee agent in fall 1976 or January 1977.  However, petitioner never performed any services for State Farm, either as employee or as independent contractor.  After 1977, she never worked in the insurance industry, although from time to time thereafter she worked in various selling jobs, sometimes as employee and sometimes as independent contractor.  As in the Kramer and Frick cases, the income paid by State Farm to petitioner in the case at hand cannot be earned income because it

was not paid as compensation for personal services actually rendered.[7]

The settlement proceeds received by petitioner do not meet the personal service requirements for earned income set forth in section 401(c)(2), section 1.401-10(c)(1), Income Tax Regs., and the relevant case law.

Inasmuch as the State Farm settlement proceeds do not constitute income from self-employment within the meaning of section 401(c)(2) or section 1402(a), petitioner is not entitled to deduct the contributions to her defined benefit plan, the TJM Pension Plan. We therefore need not address the question briefed by the parties regarding the limitations on the contribution deduction.

b. Character of Deduction for Legal Fee

Petitioner presented no evidence and requested no findings of fact on this issue and pays scant attention to it in her briefs. In her briefs, petitioner concludes by doing no more than asserting: "petitioner should be entitled to a deduction * * * of $58,459.24 for attorneys' fees and costs without regard to the limitation under I.R.C. § 67."

---

[7] Because the State Farm settlement proceeds were not the result of personal services actually rendered by petitioner, we need not determine the precise nature of the settlement proceeds or specifically characterize the settlement proceeds as a particular type of income. See Gump v. United States, 86 F.3d 1126, 1130 (Fed. Cir. 1996).

In so asserting, petitioner has conceded that she is not entitled to exclude her share of the attorney's fees in the State Farm class action lawsuit in computing her gross income from the settlement.  Petitioner's concession is well taken.  Both the Court of Appeals for the Ninth Circuit and this Court have consistently held that contingent fees paid to recover a claim to income are not excluded in computing the gross income from the recovery, not even in a class action such as in the case at hand, where the claimant retains even less control over the prosecution and settlement of the claim than she would in ordinary one-on-one litigation.  Compare Estate of Clarks v. United States, 202 F.3d 854 (6th Cir. 2000), and Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), with Benci-Woodward v. Commissioner, 219 F.3d 941, 943 (9th Cir. 2000), affg. T.C. Memo. 1998-395; Coady v. Commissioner, 213 F.3d 1187 (9th Cir. 2000), affg. T.C. Memo. 1998-291; Kenseth v. Commissioner, 114 T.C. 399 (2000); Brewer v. Commissioner, T.C. Memo. 1997-542, affd. without published opinion 172 F.3d 875 (9th Cir. 1999); Martinez v. Commissioner, T.C. Memo. 1997-126, affd. without published opinion 83 AFTR 2d 99-362, 99-1 USTC par. 50,168 (9th Cir. 1998).  See also Banks v. Commissioner, T.C. Memo. 2001-48.

Although the legal expenses of an independent contractor in prosecuting a claim arising from the conduct of his Schedule C trade or business are entitled to above-the-line treatment as

business expenses, see <u>Guill v. Commissioner</u>, 112 T.C. 325 (1999), we have denied petitioner's pension contribution deduction on the ground that the recovery in her settlement of the State Farm class action lawsuit did not constitute earned income from services actually rendered by her in conducting a Schedule C business.  There was no nexus between the recovery and the rendering of any personal services by petitioner to the payor.  The nexus was different; the recovery was connected to, had its origin in, and arose out of State Farm's invidious discrimination, which deprived her of the opportunity to perform any such services.

Our denial of petitioner's claim to a pension plan contribution deduction on that ground forecloses her claim that she is entitled to an above-the-line Schedule C deduction for legal fees, rather than the itemized deduction subject to the 2-percent limitation of section 67 that respondent allowed in the statutory notice.

To give effect to all the foregoing,

<u>Decision will be entered for respondent</u>.